UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

<u>**OPINION AND ORDER**</u>

|  |  |
|---|---|
| IN RE:<br><br>PEAK HOTELS AND RESORTS GROUP LTD.,<br><br>       DEBTOR. | Chapter 7<br><br>Case No. 17-12813 (SCC) |
| LIGHTRAY IMAGING, INC.,<br><br>       Appellant,<br><br>   v.<br><br>TAREK INVESTMENTS LIMITED,<br><br>       Appellee. | District Court Appeal No.<br><br>18 Civ. 384 (ER) |
| HIGH-DEF ZONE, INC.,<br><br>       Appellant,<br><br>   v.<br><br>TAREK INVESTMENTS LIMITED,<br><br>       Appellee. | District Court Appeal No.<br><br>18 Civ. 633 (ER) |
| IN RE:<br><br>AMAN RESORTS GROUP LIMITED<br>*a.k.a.* AHL HOTELS (2017) LIMITED,<br><br>       DEBTOR. | Chapter 11<br><br>Case No. 17-12811 (SCC) |
| LIGHTRAY IMAGING, INC.,<br><br>       Appellant,<br><br>v.<br><br>TAREK INVESTMENTS LIMITED,<br><br>       Appellee. | District Court Appeal No.<br><br>18 Civ. 681 (ER) |

Ramos, D.J.:

In these consolidated bankruptcy cases, High-Def Zone, Inc. ("High-Def") and LightRay Imaging, Inc., ("LightRay") appeal from a December 13, 2017 order of the United States Bankruptcy Court for the Southern District of New York. Tarek Investments Limited ("Tarek") and Aman Resorts Group Limited ("ARGL") move in response to these appeals. For the reasons set forth below, the Appellants' appeal is DISMISSED and the Bankruptcy Court's decision is AFFIRMED.

Before we dive in, it is important to identify the precise controversy at the heart of this appeal. It can be summarized thusly: High-Def—a small, part-time business located in suburban Lehigh Valley, Pennsylvania that installs audio-visual systems in private homes—did an installation for a friend's nephew in a studio apartment in Miami, Florida, and was not paid. Similarly straight forward was the narrow issue before the Bankruptcy Court below that is the subject of this appeal: Was High-Def's claim for payment uncontested, such that it qualified as an entity that could file an involuntary bankruptcy petition against the debtor? Relying on good and sufficient reasons, Bankruptcy Judge Shelley Chapman found that the alleged debtor had raised colorable issues concerning its liability and that High-Def's claim was therefore subject to a "bona fide dispute." That determination compelled the Bankruptcy Court to dismiss the petition. Simple enough. Why then did the briefing on appeal require a total of 105 pages, including almost 4,000 pages of appendices, and why was reference to legal proceedings in the United Kingdom's High Court of Justice, and the Eastern Caribbean Supreme Court in the High Court of Justice, British Virgin Islands, necessary? The answer to these questions is also clear: It is because this action is but a proxy battle in the scorched earth war between Omar Amanat and Vladislav Doronin over the ownership of ultra-exclusive Aman Resorts.

The legal battles between Amanat, Doronin and their affiliates date back to January 2014 and have a tortured procedural history that includes a criminal referral from the Bankruptcy Court to the United States Attorney's Office for the Southern District of New York. While the procedural history provides important context—and at times riveting entertainment—it is largely irrelevant to the resolution of the issues before the Court. This opinion will endeavor to rely on that history only as absolutely necessary.

## I.  Background[1]

In 2011, High-Def, a Pennsylvania company owned by Baljinder Minhas, designed an outdoor entertainment space for Afzal Amanat's New Jersey home. A1093–94. In December 2013, Afzal Amanat, apparently impressed with Minhas' handiwork, told Minhas that his nephew, Omar Amanat ("Amanat"), planned to acquire a significant interest in a hotel chain and that Minhas should offer him his services. A1094. On December 27, 2013, Minhas flew to Miami and met with Amanat the next day. *Id.* As a result of that meeting, Amanat asked Minhas to build centralized audio-video systems in two apartments, one at 1500 Bay Road, Apt. 1582S, Miami, Florida, and the other at 423 West Street, Penthouse 1, New York, New York. *Id.* At the time, Amanat lived at the Miami address. A145. According to a declaration provided by Minhas, Amanat wished to test the systems in these locations and then, if satisfied, install them in the hotels that he planned to acquire. A1094–A1095. High-Def offered to install the systems for $150,000, a significant amount given that High-Def's gross annual revenue never exceeded $400,000 over the course of its then eight-year life. A1095, A2859. Shortly thereafter, Minhas contacted James McCluskey, a consultant, to help him work on the project. A1095.

---

[1] The Court does not discuss LightRay's claims because, according to Appellants, "LightRay's three claims are not subject of the instant appeal." Doc. 9, 22.

On January 8, 2014, Minhas wrote Amanat to thank him for the project and to tell him that he would "setup the Savant multimedia system in Miami first, then the camera for the system in NY later." A1258. In an email sent later that day, Minhas asked, "does the apartment have a kitchen? I like to cook my own food." A1258. Amanat responded, "[y]ou can stay in the apartment but I think it will be uncomfortable - if you don't mind then it's all yours." *Id.*

On January 16, 2014, Minhas sent Amanat a contract for his services. A1118. It purports to be a contract between High-Def and Peak Hotels and Resorts Group, Ltd. ("PHRGL"), an entity that, as discussed more fully below, did not yet exist. The contract listed the address of "Peak Hotels and Resorts group" as 1500 Bay Road, Apt. 1582S, Miami, Florida, Amanat's apartment; omitted any reference to the New York location; and described the project's purpose as the "implement[ation] and integrat[ion]" of technologies or systems at "Peak Hotels and Resorts." A1115. Furthermore, it charged $100,000 for the equipment and $50,000 for labor and required the cost to be paid "when invoiced." *Id.* The contract did not list the locations of any hotel properties.

The next day, Amanat signed the contract and represented himself to be the "Sole Director, Peak Hotels and Resorts Group Ltd." A1115–A1117. The invoice, dated the same day as the contract, stated that "all work is complete" for, presumably, the installation of 12 forty-two-inch high-definition televisions, three sixty-five-inch high-definition televisions, thirty speakers, four amplifiers, and $24,600 in labor costs. A1737.

PHRGL, the entity that Amanat purported to represent, was incorporated on the same day Amanat signed the contract—January 17, 2014. Its genesis, though, began earlier, when Amanat started planning to purchase Aman Resorts, a family of exclusive hotels owned by Silverlink Resorts Ltd ("Silverlink"). A1274. On November 15, 2013, Amanat created Aman Resorts

4

Group Limited ("ARGL") to purchase the shares of Silverlink to complete the acquisition of Aman Resorts. *Id.* One month later, on December 11, 2013, he first met Doronin and the two quickly agreed to enter into a joint venture to finance the $358,000,000 necessary to purchase the Silverlink shares. A2082.

In anticipation of the acquisition, on January 17, 2014, Ogier Fiduciary Services (BVI) Limited, presumably at the direction of Doronin and Amanat, signed a Memorandum of Association and Articles of Association to incorporate PHRGL in the British Virgin Islands ("BVI"). A2241–A2270. The Articles of Association gave PHRGL's director the powers "necessary for managing, and for directing and supervising, the business and affairs of the Company." A2261. Amanat's name does not appear in the Memorandum. *Id.* Three days later, on January 20, 2014, Amanat and Ogier First Director (BVI) Limited became the directors of PHRGL. SA752. Ogier First Director (BVI) Limited resigned the same day, thus making Amanat the sole director. *Id.*

On January 22, 2014, Amanat re-executed the contract with High-Def, again identifying himself as PHRGL's Sole Director. A1119–A1121. No change was made in the High-Def contract except for the date.

On January 31, 2014, within seven weeks of when Amanat and Doronin first met, an entity owned by Amanat, Peak Hotels and Resorts ("Peak"), and an entity owned by Doronin, Tarek Investments ("Tarek"), entered into a joint venture, PHRGL, to purchase ARGL and fund its acquisition of Silverlink. A719. The acquisition was financed by a $190,000,000 equity investment provided by Peak and Tarek, and by a $208 million loan provided by Pontwelly Holding Company, another entity owned by Doronin. Tarek owned 65% of PHRGL and Peak owned 35%. PHRGL's only asset was its ownership of ARGL.

Within months of the acquisition, the relationship between Amanat/Peak on the one hand, and Doronin/Tarek on the other, had soured, and in June 2014 Amanat caused Peak to sue Tarek and others in the United Kingdom's High Court. That matter settled in March 2016 with the result that Peak's claims were dismissed or otherwise withdrawn, and Tarek gained control of PHRGL.

Meanwhile, in August 2015, Pontwelly, the Doronin-owned firm that had provided the loan that financed the purchase of Silverlinks, completed a strict foreclosure pursuant to which it obtained title to the Silverlinks shares, effectively taking ownership of Aman Resorts. Pontwelly then transferred the shares to A.H. Overseas Ltd. ("AH Overseas"). Effectively therefore, after the foreclosure, Doronin owned Aman Resorts, and Amanat was completely shut out. According to Appellees, it was that transaction, the foreclosure of the Silverlink shares and their ultimate transfer to AH Overseas, that has been the motivating force behind the more recent serial litigations/bankruptcy filings initiated by Amanat and his affiliates.

As relevant to this appeal, neither ARGL nor PHRGL have any debt or domicile in the United States. In addition, ARGL has been dormant since March 2016. On August 12, 2016, ARGL and PHRGL were struck from the BVI corporate register for failure to have a BVI registered agent appointed.

A.      **The March 2016 Bankruptcy**

The petition that is the subject of this appeal was originally filed in the Southern District of Florida in April 2017. It was transferred here on motion of the Appellees by virtue of a pending related involuntary petition filed in 2016. The 2016 bankruptcy was assigned to Judge Chapman. The procedural history of the 2016 bankruptcy is directly related to the instant appeal and therefore requires a detailed discussion.

On March 4, 2016, shortly after Amanat lost his ownership stake in PHRGL in connection with the resolution of the UK action, Amanat and others filed an involuntary petition against ARGL for unpaid directors fees and unpaid transaction fees under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Southern District of New York. SA1–SA4. Three days later, on March 7, 2016, the law firm Brown Rudnick LLP, purporting to act on behalf of the directors of ARGL, answered on behalf of ARGL and consented to the involuntary petition. SA11. On March 9, 2016, the Bankruptcy Court entered an order for Chapter 11 relief, thereby initiating the bankruptcy proceedings. SA142.

Meanwhile, on March 10, 2016, a day after the Bankruptcy Court entered the order for Chapter 11 relief, ARGL's board of directors, having learned that Brown Rudnick had consented to the involuntary petition purportedly on its behalf, voted (1) to "confirm that Brown Rudnick . . . has not been and are not appointed as lawyers to [ARGL] including in relation to the purported [bankruptcy proceedings]" and (2) to "appoint Kasowitz, Benson, Torres & Friedman LLP ("Kasowitz") to represent [ARGL] in the [bankruptcy proceedings] and any related actions." SA349.

On March 11, 2016, Kasowitz filed a notice of appearance on behalf of ARGL and a motion to (1) strike the answer and consent to entry of order for relief filed by Brown Rudnick, (2) dismiss the chapter 11 case, (3) and impose attorneys' fees, costs, and sanctions. *In re Aman Resorts Group Ltd.*, Case No. 16-10517 (SCC), ECF No. 7 (notice of appearance); SA148–SA183 (motion). Later that day, Brown Rudnick filed a notice of motion to withdraw as ARGL's counsel because it had determined that its continued representation of ARGL in the case

would be inconsistent with Rule 1.16 of the New York Rules of Professional Conduct.  SA143–SA147.[2]

At a hearing held on March 28, 2016, Brown Rudnick represented to Judge Chapman that it had been retained to represent ARGL and to consent to the involuntary petition by an entity that "purported to be authorized to act for [ARGL]."  SA711.  When pressed concerning what *person* had asked for the retention, Brown Rudnick responded that one such person was Amanat.  SA712.  Brown Rudnick subsequently determined that Amanat had no authority to act on behalf of ARGL and thus requested to withdraw.[3]  SA716–SA717.

Brown Rudnick further explained that it had consented to the bankruptcy on behalf of its clients because it had hoped to challenge as a voidable transfer the foreclosure that resulted in ARGL's losing its shares of Silverlink.  After hearing this justification, Judge Chapman interjected, "[T]hat's not a proper purpose for filing an involuntary."  SA715–SA716.  After this exchange, Judge Chapman stated, "This case is going to be dismissed, but with a reservation of jurisdiction to impose sanctions and other appropriate relief both under Rule 11 and under the Bankruptcy Code."  SA725.  The next day, the court entered orders granting Brown Rudnick's motion to withdraw and Kasowitz's motion on behalf of ARGL to dismiss.  *In re Aman Resorts Group Ltd.*, Case No. 16-10517 (SCC), ECF Nos. 32, 35.  In the March 29 order, Judge

---

[2] In the relevant part, that Rule provides as follows:

> A lawyer shall not accept employment on behalf of a person if the lawyer knows or reasonably should know that such person wishes to:  (1) bring a legal action, conduct a defense, or assert a position in a matter, or otherwise have steps taken for such person, merely for the purpose of harassing or maliciously injuring any person; or (2) present a claim or defense in a matter that is not warranted under existing law, unless it can be supported by a good faith argument for an extension, modification, or reversal of existing law.

N.Y. Rules of Prof'l Conduct r. 1.16(a).

[3] As discussed below, Brown Rudnick would later have to pay $325,000 in attorney's fees to ARGL for its role in the filing.

Chapman also ordered "that the Court shall retain jurisdiction with respect to this order and ARGL's motion for an order imposing attorney's fees, costs, and sanctions."

At a subsequent hearing held on July 14, 2016, Judge Chapman stated as follows:

> I think that it is very serious to file an involuntary in bad faith, as this one clearly was, and I would say it appears to have been filed in bad faith-plus, not merely a couple of disgruntled creditors who think they can file an involuntary and turn out that they're mistaken, but truly in bad faith.

SA739.

As relevant to this appeal, the result of the 2016 Bankruptcy was that Judge Chapman found that the involuntary petition had been orchestrated by Amanat and others for an improper purpose—to seek to void the foreclosure of the Silverlink shares.

On August 12, 2016, Peak, PHRGL, and ARGL were struck off the Register of the BIV. SA754, A1878.

With that background, we can return to this case.

**B.     High-Def's Involuntary Petition**

In the year after the installation at the Miami apartment, during the events described above, High-Def's owner, Baljinder Minhas, repeatedly attempted to collect from Amanat by sending nine increasingly frustrated emails to Amanat at a peakadventurespartners.com[4] email address between January 30, 2014 and January 14, 2015.  A1123–A1139.  Amanat responded to the first four of these emails from that email address.  *Id.*  In these emails, Amanat wrote, "[w]e absolutely are happy with the service and equipment you provided" and "I will send payment asap."  A1134.

---

[4]  Peak Adventures is not identified in the parties' briefs.

In addition to Minhas's collection efforts, High-Def's consultant, James McCluskey, emailed an address purportedly used by Doronin, Vladislav.Doronin@amanresortsgroupltd.com, to request payment on six different occasions between August 2015 and July 2016. A1141–A1147. There is no indication that Doronin ever responded to, let alone received, these emails.[5]

In Minhas' declaration, he explained that he had learned that LightRay[6] had—at the suggestion of Amanat—purchased claims against PHRGL and that he had unsuccessfully attempted to sell High-Def's claims to LightRay. A1096. He also declared that LightRay told him that initiating an involuntary bankruptcy against PHRGL could generate enough proceeds to cover High-Def's invoices. Before taking such a step, however, Minhas called Amanat, who told Minhas that PHRGL was broke and that "High-Def's best shot of getting paid was to initiate an involuntary bankruptcy case." *Id.*

Amanat also referred Joel Aresty, a Florida bankruptcy lawyer, to High-Def. A1880. On April 21, 2017, McCluskey signed a retainer with Aresty, ordered him to file the petition, and informed him that "Omar [Amanat] offered to have someone pay the $2500." A1153. Aresty advised Amanat to "make sure owner knows he is getting his company into litigation." A1150. According to email communications from Aresty to the Kasowitz firm, Aresty confirmed that he was initially paid by Amanat, and later by Lightray's CEO, Farooq, for representing High-Def.

On April 24, 2017, Aresty filed an involuntary petition under Chapter 7 of the Bankruptcy Code on behalf of High-Def against PHRGL in the Florida Bankruptcy Court. A1–A2. High-Def claimed that PHRGL owed it $150,029.76. *Id.* It listed PHRGL's address as 1500 Bay Road

---

[5] Doronin claims that he has never used this email address. Doc. 10, 28.

[6] One of the owners and principals of LightRay is Ali Farooq. Farooq is related to Amanat by marriage. LightRay is in the business of purchasing creditor claims and is a litigation funder.

1582S, Miami Beach, FL 33139, Amanat's apartment. A1. Jurisdiction was based on the fact

that PHRGL had property in the Southern District of Florida in the form of an unused $2,500

retainer PHRGL had paid to Russell Adler, an attorney there. A18; A25. Adler subsequently

submitted an affidavit stating that Amanat had provided the retainer. A1831.

On April 25, 2017, the Clerk of Court for the United States Bankruptcy Court for the

Sothern District of Florida issued a summons. A3. On April 26, 2017, Aresty certified service

on "Registry, Peak Hotels and Resorts Group Ltd, Company Number 1808788, Nemours

Chambers, Road Town, Tortola, British Virgin Islands." A5. As explained above, however,

PHRGL had been struck from the BVI Register almost eight months before it was allegedly

served. SA754, A1878. Accordingly, PHRGL was not served with High-Def's petition because

there was no such entity on the Register to serve.

Not surprisingly, therefore, on May 18, 2017, the Florida Bankruptcy Court ordered relief

for High-Def because PHRGL had "failed to file any timely pleading or defense to the petition as

required by Bankruptcy Rule 1013(b)." A10. On May 22, 2017, the Florida Bankruptcy Court

appointed Jacqueline Calderín to serve as the Chapter 7 Trustee. A20. On June 16, 2017,

Calderín filed the Initial Schedules and Summary of Assets and Liabilities. A18–A44. It listed

High-Def and LightRay as the only parties with nonpriority unsecured claims. A32.

On June 29, 2017, Calderín filed an emergency motion to authorize post-petition

financing to preserve the value of the estate's equity interests in PHRGL's subsidiary, ARGL. *In

re Peak Hotels and Resorts Group, LTD*, Case No. 17-15041-AJC, ECF No. 28. Specifically, it

asked the court to approve a $100,000 loan from LightRay to fund the administrative and

litigation costs of the Chapter 7 case. *Id.*

On July 6, 2017, LightRay filed an unopposed *ex parte* motion to reinstate PHRGL and ARGL to the BVI Register. A56. The Bankruptcy Court granted the motion and ordered "that LightRay and any other creditor of [PHRGL], in consultation with the Chapter 7 Trustee, may seek and obtain the reinstatement of the [PHRGL] with the registry, or whatever is the appropriate governmental agency, in the British Virgin Islands." A59–A60. The purported rationale for the motion was that reviving both PHRGL and ARGL was necessary to realize value for the creditors of PHRGL. Indeed, Calderín argued that reviving the companies was "the only option that will allow the Trustee . . . to realize value for creditors." A53.

On August 1, 2017, Calderín filed an emergency omnibus motion to: (a) approve the trustee's selection of registered agency *nunc pro tunc* to July 28, 2017; (b) authorize the trustee to direct the filing of U.S. and BVI insolvency proceedings for debtors' subsidiary *nunc pro tunc* to August 1, 2017; (c) authorize the trustee to appoint a director of debtor's wholly owned subsidiary, ARGL, *nunc pro tunc* to August 1, 2017; and (d) authorize the trustee to enter into a cross-border protocol agreement. A61–A70. The motion did not mention ARGL's pending Chapter 11 bankruptcy in the Southern District of New York. *Id.* Shortly thereafter, the Florida Bankruptcy Court granted the motion, authorizing Calderín to replace ARGL's directors and to send the company into bankruptcy. A92–A93. Calderín appointed Madison Director Services Limited ("Madison Director Services") to serve as ARGL's sole board member and director. A94.

On August 2, 2017, Calderín convened a meeting with Amanat pursuant to 11 U.S.C. § 341 to explore PHRGL's assets and liabilities. SA786. Calderín contacted Amanat because, among other reasons, she "happened to have his phone number readily available," as certain

partners at her law firm had spoken to Amanat some months prior to commencement of the

PHRGL case about a potential engagement.  SA783, SA785.

On August 8, 2017, Paul Pretlove, an agent of Madison Director Services, at the behest of

Calderín, filed a voluntary petition under Chapter 11 of the Bankruptcy Code to send ARGL into

bankruptcy in the Florida Bankruptcy Court.  *In re Aman Resorts Group Ltd.*, Case No. 17-

12811 (SCC), ECF No. 1.  The petition listed ARGL's address as 122 E. 42nd Street, Suite 2100,

New York, New York 10168. [7]  *Id.*  The court granted this voluntary petition.  A94.

To recap, by mid-August 2017, ARGL had been put into yet another bankruptcy by

entities other than its directors or authorized representatives.  Moreover, the Chapter 7 Trustee

gutted ARGL's board of directors and replaced it with her nominee, who promptly consented to

place it into bankruptcy in Florida.  And, based on affidavits and documentary evidence

presented to Judge Chapman, she could find that Amanat was involved in every aspect of the

transaction:  He provided the *forum*  (by his payment of a retainer to a Miami lawyer, making

jurisdiction in the Southern District of Florida proper), the *petitioner* (by hiring High-Def to do

work in his apartment), the *petitioner's lawyer* (by initially paying Aresty's fees), the *cause of

action* (via his failure to pay High-Def), the *theory of the case* (by suggesting to High-Def's that

it's best chance of getting paid was to initiate an involuntary bankruptcy against PHRGL), and

the *funding to prosecute the litigation* (by his relationship with litigation funder LightRay).

Moreover, while this had the imprimatur of the Florida Bankruptcy Court, it had all been

accomplished *ex parte* because PHRGL was never properly served and hence, knew nothing

---

[7] This is the same address as the address for Kent Gross—the lawyer who represented Amanat and who filed the
2016 bankruptcy case in the Southern District of New York that Judge Chapman found to have been filed in bad
faith.  SA3.

about what had transpired to date.  On August 15, 2017, the directors of ARGL and PHRGL first learned of the Florida Bankruptcy proceedings.

At 3:51 p.m. that day, the Kasowitz firm, on behalf of ARGL, emailed Aresty, "As you will see from the attached docket, Omar Amanat, who is currently under indictment for securities fraud, orchestrated a fraudulent bankruptcy filing in the Southern District of New York, which filing resulted in Brown Rudnick, as purported counsel to Aman Group Resorts Limited, agreeing to pay my client $325,000 in legal fees" and "[t]he filing in the Southern District of Florida are copycat filings of the Southern District of New York case."  A151.

Twenty minutes later, at 4:11 p.m., Aresty wrote Amanat, "[A]re you kidding me?  [N]o sanctions?  $300,000."  A1478.  Three minutes later, Amanat responded as follows:

> That's a settlement -not sanctions –[K]asowitz [w]ent heavy after them because Brown Rudnick withdrew after they filed under corporate authority of a BVI order that gave Omar's director ability to file chapter 11 Doronin lawyers Glenn then removed Amanat's director and [B]rown [R]udnick withdrew.  There was no ruling that the involuntary claims were false.  Speak to my attorneys who have evidence.  I'll have them call you.

A1477.  Aresty responded, "This looks very bad Sir," "I am very unhappy," "and I am not going to play games at my pay grade."  A1476.  Amanat replied, "Call me back to increase your pay grade sir."  *Id.*

On August 22, 2017, ARGL and Tarek, represented by the Kasowitz firm, moved to transfer the cases filed in the Florida Bankruptcy Court to this District as related to the previously-filed bankruptcy case that was still pending before Judge Chapman.  SA745–747. During a telephonic conference held on August 25, 2017, Judge Chapman stated her intention to enter an order directing the parties in the Florida Bankruptcy case to proceed no further in that case.  On September 6, 2017, a hearing was held on Kasowitz's motion to transfer venue of the Florida Bankruptcy case to New York.  The Judge granted the motion, ultimately without

objection from Trustee Calderín.  Subsequently, on September 14, 2017, Judge Chapman issued

an order in which she:  (1) acknowledged her continuing jurisdiction over the 2016 ARGL

bankruptcy case; (2) vacated the order dismissing that case "provided, however, that entry of this

Order shall have no effect upon any of the Court's prior rulings concerning, among others, the

involuntary petitions and answer filed in this case, all of which shall remain valid and in full

force and effect;" and (3) transferred the PHRGL and ARGL bankruptcy cases from the Southern

District of Florida to the Southern District of New York.  SA1000-SA1001.

On October 13, 2017, ARGL and Tarek moved to dismiss the respective Chapter 7 and

Chapter 11 cases.  A363–A365; A1893–A1895.  LightRay filed memoranda in opposition to the

motions.  A452–A503; A426 –A436.  Jacqueline Calderín, the former Chapter 7 Trustee for the

estate of PHRGL, and High-Def filed memoranda in opposition to the motion to dismiss the

PHRGL Chapter 7 case.  A1156; A1898–A1908

On November 30, 2017, Judge Chapman held a hearing on the motions.  A1480–A1522.

Judge Chapman started by noting that "there are a lot of very serious allegations here" and that,

"if there is not already, there will be a referral to the United States Attorney's Office, which is

aware of these cases."  A1486–A1487.  The Court then explained that a creditor may only file an

involuntary petition if the creditor has an undisputed debt acknowledged by the debtor.  A1487–

A1488.  ARGL and Tarek argued that High-Def's claim was subject to a bona fide dispute

because:  (1) Amanat negotiated the contract before PHRGL existed; (2) PHRGL never had an

office in Miami or New York, let alone at the location where Minhas allegedly installed the

equipment; (3) PHRGL's records contained no evidence of this contract; and (4) Amanat was the

only person associated with PHRGL who had any knowledge of the contract.  A1494 –A1495.

High-Def argued that it had provided sufficient evidence of a contract, demands for payment,

and a promise to satisfy the requests.  A1500.  Judge Chapman considered these arguments and stated:  "[W]hether or not [Amanat] had authority to [hire High-Def] on behalf of [PHRGL], that is the subject of a bona fide dispute, period."  A1503.  This issue was decided because "I am simply identifying that based on the record before me, I can find that there is a bona fide dispute" and because "[t]he Code simply requires that the claim not be subject to a bona fide dispute."  A1502, A1505.  Judge Chapman made it clear, however, that, "I'm not making a factual finding."  A1505.  Judge Chapman dismissed the ARGL case as void *ab initio*.  A1510; *see also* A1488–A1489 ("[T]he involuntary should be dismissed and everything that was filed in furtherance of it and in connection with it, is void *ab initio*, and it goes away." (italics added)).

## II.     Standards of Review

In this appeal, the Court must determine, *inter alia*, whether the Bankruptcy Court properly dismissed PHRGL's bankruptcy case because there was a bona fide dispute about the debt.  The parties disagree about the proper standard of review.

Courts apply different standards when reviewing a bankruptcy court's factual findings and conclusions of law.  Appellants argue that the Court should review the decision at issue under a *de novo* standard of review because the Bankruptcy Court dismissed the PHRGL bankruptcy "[w]ithout making any factual findings."  Doc. 9, 16.[8]  To support this point, Appellants cite the Bankruptcy Court's statement that she was "not making factual findings."  A1502.

Appellants are mistaken.  As Judge Chapman made exceedingly clear, she concluded that High-Def's claim was subject to a bona fide dispute based on the facts before her.  Doc. 10, 15 ("I am simply identifying that based on the record before me, I can find that there is a bona fide

---

[8] The Court refers to the documents on the docket for No. 18 Civ. 384 (ER).

dispute" (citing A1502)); *id.* ("So I'm going to enter an order dismissing the case, solely on the basis that . . . the claim is subject to a bona fide dispute, and therefore does not qualify as a debt that can support an involuntary petition," (citing A1508)); *id.* at 17–18 ("I'm not going to . . . grant you judgment based on the facts that [Amanat] said come in and install this video equipment; I'm about to launch this group of luxury hotels." (citing A1503)).  To the extent Judge Chapman stated that she was not making a factual finding, she was clearly referring to who would ultimately win the dispute.  A1488 ("This is a claim that's subject to a bona fide dispute.  It does not require me to make a finding on who wins that dispute."); A15005 (We're not having a trial on who wins or loses the dispute.  That's not what the Code requires.  The Code simply requires that the claim not be subject to a bona fide dispute.").  Accordingly, the Court will review this finding for clear error.  *In re BDC 56 LLC*, 330 F.3d 111, 119 (2d Cir. 2003) ("[W]hether a claim is subject to a bona fide dispute will sometimes be a factual question, such as where conflicting affidavits or documentary evidence raise an issue as to whether a creditor has been paid or is, in fact, owed anything"), *abrogated on other grounds by In re Zarnel*, 619 F.3d 156 (2d Cir. 2010).

## III.    Discussion

Appellants appeal the Bankruptcy Court's dismissal of PHRGL's Chapter 7 bankruptcy and vacating of ARGL's Chapter 11 bankruptcy.  The Court examines these cases individually.

## A.    PHRGL Case

Appellants challenge the Bankruptcy Court's dismissal of PHRGL's bankruptcy case in a number of ways:  that Tarek lacked standing; that the Bankruptcy Code does not provide a cause of action to Tarek; that the Bankruptcy Court did not follow the right procedures in dismissing the Florida Bankruptcy Court's order; and, on the merits, that the Bankruptcy Court improperly

determined that High-Def's claim was subject to a bona fide dispute. The Court addresses these arguments in turn.

### 1. Constitutional Standing

Appellants claim that Tarek lacked constitutional standing[9] to seek the dismissal of PHRGL's Chapter 7 case.[10] Three elements form the constitutional minimum of standing. First, the plaintiff must have suffered an injury in fact, an invasion of a legally protected interest that is concrete and particularized, and actual or imminent. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted). Second, the challenged conduct must have caused the plaintiff's injury. *Id.* Third, it must be likely, not speculative, that a favorable decision by the court will redress the plaintiff's injury. *Id.*

The parties only dispute the first prong of the test. Generally, that prong, "the 'injury in fact' test[,] does not require financial injury, nor does it require direct effect." *In re Gucci*, 126 F.3d 380, 388 (2d Cir. 1997). Indeed, "it has long been recognized that a legally protected interest may exist solely by virtue of statutes creating legal rights, the invasion of which creates

---

[9] Appellants argue that Tarek also lacks prudential standing. Doc. 9, 45. Traditionally, prudential standing has included the "rule against the adjudication of generalized grievances, the rule prohibiting plaintiffs from asserting the rights of third parties, and the rule barring claims that fall outside the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Montesa v. Schwartz*, 836 F.3d 176, 195 (2d Cir. 2016) (internal quotations marks and citations omitted). More recently, in *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127–28 (2014), "the Supreme Court removed [the] third requirement from the standing analysis" and "defined the zone of interests test as a merits question concerning the definition of the cause of action and not a standing issue." *Mantena v. Jounson*, 809 F.3d 721, 731 n. 10 (2d Cir. 2015) (internal citation omitted). Appellants ignore *Lexmark Int'l, Inc.* and argue that Tarek lacks prudential standing because it did not "explain[] how its interests were or could have been affected by dismissal." Doc. 9, 45.

Along the same lines, Appellants claim that Tarek lacks "statutory standing" under either §§ 303(d) and 502(a) of the Bankruptcy Code. Doc. 9, 46–49. Referring to these questions as standing issues also mischaracterizes the law because "[t]he Supreme Court has recently clarified . . . that what has been called statutory standing in fact is not a standing issue, but simply a question of whether the particular plaintiff has a cause of action under the statute." *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) (internal quotation marks and citation omitted).

[10] Judge Chapman did not explicitly address these issues.

standing, even though no injury would exist without the statute." *Donoghue v. Bulldog Inv'rs Gen. P'ship*, 696 F.3d 170, 175 (2d Cir. 2012) (internal quotation marks and citations omitted).

Appellees contend that Tarek has constitutional standing and has suffered an injury in fact as one of PHRGL's shareholders because, as a result of the order that sent PHRGL into bankruptcy, "a Chapter 7 trustee obtained the legal authority – previously held solely by [PHRGL's] shareholders and directors – to 'collect and reduce to money the property of the estate.'" Doc. 10, 41 (citing 11 U.S.C. § 704(a)(1)). Additionally, to claim that this injury suffices, Appellees cite to *In re Leong P'ship*, No. 4:16-BK-42363, 2018 WL 1463852, at *5 (B.A.P. 9th Cir. Mar. 23, 2018), which held, "it is beyond cavil that the filing of an involuntary bankruptcy petition against a partnership directly and significantly impacts those alleged to be general partners of that partnership." *See also In re Licores*, No. SA 13-10578-MW, 2013 WL 6834609, at *4 (C.D. Cal. Dec. 20, 2013) (finding that appellee suffered an injury in fact when it was "deprived of her exclusive right to file bankruptcy on behalf of Appellant").

The Supreme Court has used broad language to recognize the fact that losing a legal right may satisfy standing's injury-in-fact requirement. In *Lujan v. Defs. of Wildlife*, it stated, Congress may "elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." 504 U.S. 555, 578 (1992) (internal quotation marks and citation omitted). And, in *Warth v. Seldin*, it wrote, "The actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." 422 U.S. 490, 500 (1975) (internal quotation marks and citation omitted). Moreover, the Second Circuit has applied this rule in a wide range of circumstances. For example, in *Strubel v. Comenity Bank,* it "easily conclude[d] that [plaintiff] satisfie[d] the legal-interest requirement of injury in fact" because plaintiff alleged that the defendant had failed to make

statutorily required disclosures.  842 F.3d 181, 188 (2d Cir. 2016); *see also Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (finding that the "breach of an alleged agreement between [the plaintiff] and [a manufacturer]" amounted to an "injury in fact").

Here, it is clear that Tarek lost a legal right.  As a shareholder Tarek was capable of appointing directors and had rights under PHRGL's organizational documents to manage its assets.  As a result of the Florida Bankruptcy Court's appointment of a trustee, Tarek lost those rights.  This is plainly sufficient to provide constitutional standing.[11]

Appellants argue based on a Seventh Circuit case, *In re Cult Awareness Network, Inc.*, 151 F.3d 605 (7th Cir. 1998), that a different injury in fact test applies in the bankruptcy context and that "[i]n a bankruptcy case, a party may demonstrate 'an injury in fact' by showing a direct financial interest in the outcome of a particular proceeding."  Doc. 9, 44.  According to its own language, however, *In re Cult Awareness Network, Inc* concerned standing under the Bankruptcy Code—not Article III standing.  151 F.3d at 607 ("Bankruptcy standing is narrower than Article III standing.").  As a result, it does not inform the Court's decision on constitutional standing.

## 2.     Tarek's Standing Under the Bankruptcy Code

Appellants assert that § 303(d) of the Bankruptcy Code provides Tarek with standing to challenge the involuntary bankruptcy petition that they filed in Florida.  Section 303(d) provides, "The debtor, or a general partner in a partnership debtor that did not join in the petition, may file an answer to a petition under this section."  11 U.S.C. § 303(d).  While Tarek was neither a debtor nor a general partner in that litigation, at least one bankruptcy court within this District

---

[11] Appellees also claim that Tarek is directly and adversely affected pecuniarily by the challenged order of the bankruptcy court because High-Def has expressed its intention to bring claims against Tarek in the bankruptcy process and because Tarek must expend resources to defend itself against that suit.  Doc. 10, 42–43.  This future injury may also suffice because "[t]he right to be free of litigation gives one standing, let alone the prospect of a future claim for attorneys' fees."  *U.S. ex rel. Thistlethwaite v. Dowty Woodville Polymer, Ltd.*, 6 F. Supp. 2d 263, 265 (S.D.N.Y. 1998).

has held that a shareholder may sue under § 303(d). In *In re Westerleigh Dev. Corp.*, the bankruptcy court noted, "there is no express statutory authority for stockholders to contest an involuntary petition filed against their corporation" but, "the debtor in the instant case is unable to answer the petition because it[']s only two shareholders . . . on either side of the case, with neither having authority to act for the corporation," and "either shareholder should be afforded standing to contest an involuntary Chapter 11 petition filed against the corporation." 141 B.R. 38, 40 (Bankr. S.D.N.Y. 1992). The court also noted that the United States Bankruptcy Court for the Middle District of Louisiana assumed that "under certain circumstances, stockholders might be permitted to contest an involuntary petition against their corporation where there was a plan or scheme to achieve fraud." *Id.* Other courts have come to similar conclusions. *See In re Nat'l Republic Co.*, 109 F.2d 167, 170 (7th Cir. 1940) ("Stockholders and state court receivers have never had such absolute right [to contest an involuntary petition], although it lay within the discretion of the District Court to permit them to intervene upon a proper showing."); *In re Oakland Popcorn Supply, Inc.*, 213 F. Supp. 665, 667 (N.D. Cal. 1963) ("While it is true that stockholders of a bankrupt corporation have no statutory right to contest an involuntary petition, it is within the discretion of the bankruptcy court to permit them to do so."); *In re Autumn Press, Inc.*, 20 B.R. 60, 63 (Bankr. D. Mass. 1982) ("[A]s a stock holder, Dreier has standing to contest the filing of this petition on the ground of lack of corporate volition.").

The circumstances present here are exactly the type of circumstances warranting Tarek to contest the PHRGL involuntary petition under § 303, pursuant to *Westerleigh*, because the petition that commenced the PHRGL case was never properly served on PHRGL or its directors. Doc. 10, 45–46. Thus, the relief was granted to High-Def on an essentially *ex parte* basis. To deny Tarek standing, it argues, would allow petitioning creditors to obtain a final order for relief

simply by failing to provide proper notice to the alleged debtor and its directors and shareholders. *Id.* at 46.

Appellants claim that *Westerleigh* was wrongly decided. They note that the plain text of § 303(d) only mentions debtors and partners and that by giving Tarek, a PHRGL equity holder, standing, Appellees seek to alter the rules of statutory construction and circumvent the clear language of the Bankruptcy Code. Doc. 15, 12. Appellants further argue that the Court may not make an exception to this rule because in *Law v. Siegel*, 571 U.S. 415 (2014), the Supreme Court held, according to Appellants, "that bankruptcy courts . . . have no general, equitable power to remedy bad faith or fraudulent conduct." Doc. 15, 8–9.

Appellants' proposition is clearly wrong. Bankruptcy courts have the "inherent power of every federal court to sanction abusive litigation practices." *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 376 (2007) (internal quotation marks and citation omitted). PHRGL did not answer the involuntary petition filed by High-Def because it was never served. Indeed, Appellants do not and cannot dispute that service in the Florida Bankruptcy case was made on an unregistered company with no agent. Here, as was the case in *Westerleigh*, 141 B.R. at 40, the Bankruptcy Court properly drew upon its inherent powers to allow a shareholder to answer an involuntary petition and stand in the shoes of a debtor that could not respond for itself. *Law* does not curtail this power as Appellants suggest. Doc. 15, 8–9. Instead, it merely held that the bankruptcy court could not take an action *specifically prohibited* by the Bankruptcy Code. 571 U.S. at 422 ("Thus, the Bankruptcy Court's [action] was unauthorized if it contravened a specific provision of the Code"). Appellants have identified no provision of the Bankruptcy Code that prohibits this decision.[12]

---

[12] Appellants also argue that § 502(a) of the Bankruptcy Code does not provide Appellees with standing because they do not qualify as "parties in interest." Doc. 9, 46–48. In interpreting this language, the Second Circuit has

**3.      The Bankruptcy Court Properly Dismissed the Order of the Florida Bankruptcy Court**

Appellants argue that the Bankruptcy Court improperly dismissed the order of the Florida Bankruptcy Court that sent PHRGL into bankruptcy.  Doc. 9, 31–32.  Appellees argue that pursuant to § 707(a) of the Bankruptcy Code, a bankruptcy court may dismiss a case after notice and a hearing and only for cause.  11 U.S.C. § 707(a).  According to the Second Circuit, "[c]ourts must engage in case-by-case analysis in order to determine what constitutes cause sufficient to warrant dismissal" pursuant to this provision.  *In re Murray*, 900 F.3d 53, 58 (2d Cir. 2018) (internal quotation marks and citation omitted).  "A bankruptcy court's decision to dismiss a case for cause under Section 707(a) is guided by equitable considerations and is committed to the sound discretion of the bankruptcy court."  *Id.*

A number of courts have held that a bankruptcy court may under § 707(a) dismiss an improperly filed bankruptcy petition.  *See In re Seaman*, 340 B.R. 698, 708 (Bankr. E.D.N.Y. 2006) ("The petitioner's ineligibility to be a debtor is also cause to dismiss a bankruptcy case under Sections 707(a)"); *Am. Telecom Corp. v. Siemens Info. & Commc'ns Network, Inc.*, No. 04 C 8053, 2005 WL 5705113, at *3 (N.D. Ill. Sept. 7, 2005) ("Although the general rule is that a hearing is required prior to dismissal, *see* 11 U.S.C. § 707(a) . . . , when, as here, there is no dispute over the material facts and it is apparent on the face of the record that the case is irremediably defective, the court need not go through the motions of a hearing."); *In re Valdez*, 250 B.R. 386, 390 (D. Or. 1999) (affirming a bankruptcy court's decision to find that "cause for

---

held, "a Chapter 7 debtor is a 'party in interest' and has standing to object to a sale of the assets, or otherwise participate in litigation surrounding the assets of the estate, only if there could be a surplus after all creditors' claims are paid."  *In re 60 E. 80th St. Equities, Inc.*, 218 F.3d 109, 115 (2d Cir. 2000).  The Court need not decide whether Appellees could sue under § 502(a) because they can sue under § 303(d).

dismissal existed under 11 U.S.C. § 707 because the involuntary petition and the debtors' acquiescence were intended to establish relief under the code for improper purposes, i.e., to circumvent the court's previous order in the prior bankruptcy").

Section 303 allows creditors to file involuntary petitions only if the petitioners hold claims that are "not contingent as to liability or the subject of a bona fide dispute." 11 U.S.C. § 303(b)(1). During the November 30, 2017 hearing, Judge Chapman found that High-Def's involuntary petition did not comply with this requirement, noting that, "if you look up 'bona fide dispute' in the dictionary, you'll see a picture of the Hi[gh]-Def claim." A1487–A1488. She then held a hearing on the parties' arguments and announced, "I'm going to enter an order dismissing the case, solely on the basis that the claim is not—the claim is subject to a bona fide dispute, and therefore does not qualify as a debt that can support an involuntary petition." A1508. By finding that High-Def had not properly filed an involuntary petition pursuant to §303(b)(1) and by giving Appellants an opportunity to convince her otherwise, Judge Chapman satisfied § 707's cause and notice requirement.[13]

Appellants argue in the alternative that PHRGL's failure to file a responsive pleading constitutes a waiver of any argument that the involuntary petition did not comply with the bona fide dispute requirement of Section 303(b). Doc. 9, 34. Of course, this argument begs the question of whether service of the petition was properly served on PHRGL.

Federal Rule of Bankruptcy Procedure 1010(a) provides, "When an involuntary petition is filed, service shall be made on the debtor." Rule 1011(b) provides, "Defenses and objections to the petition . . . shall be filed and served within 21 days after service of the summons." As

---

[13] Appellants claim in their opening brief that Judge Chapman improperly dismissed the Florida court's order and Appellees assert in their opposition that Judge Chapman properly relied on her § 707 power. Appellants do not respond to this argument in their reply.

discussed above, on August 12, 2016, PHRGL was struck from the Register of the BVI.  SA754, A1878.  Eight months later, on April 26, 2017, High-Def's lawyer certified service on "Registry, Peak Hotels and Resorts Group Ltd, Company Number 1808788, Nemours Chambers, Road Town, Tortola, British Virgin Islands."  A5.  Because High-Def claims to have served PHRGL in the BVI after its termination, there is reason to believe that neither PHRGL nor its former shareholder, Tarek, ever received service.  Indeed, they affirmatively disclaim that they were served.  Because they were never served, neither PHRGL nor Tarek can be held responsible for failing to respond to the involuntary petition, pursuant to Rule 1011(b).

**4.      High-Def's Claim Was Subject to a Bona Fide Dispute**

High-Def filed an involuntary petition pursuant to 11 U.S.C. § 303.  A1–A2.  To commence an involuntary petition, a creditor must be a "holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount." 11 U.S.C. § 303 (b)(1).  "Courts apply an objective test in determining whether a bona fide dispute exists."  *In re TPG Troy, LLC*, 793 F.3d 228, 234 (2d Cir. 2015).  "There is a bona fide dispute if there is either a genuine issue of material fact that bears upon the debtor's liability or a meritorious contention as to the application of law to undisputed facts."  *Id.* (internal quotation marks and citation omitted).  The burden of proving and disproving a bona fide dispute moves from the creditor to the debtor.  Initially, the creditor must "establish a prima facie case that no bona fide dispute exists" but, "[o]nce a prima facie case has been established, the burden shifts to the debtor to demonstrate the existence of a bona fide dispute."  *Id.*

The Second Circuit interpreted these standards in *TPG Troy*.  In that case, a creditor entered into a contract with a debtor but the creditor filed an involuntary petition against a third party on the theory that the debtor merely served as an alter ego for that third party.  *Id*. at 234.

The Second Circuit affirmed the bankruptcy court's holding that a bona fide dispute existed because, *inter alia*, the third party "vigorously dispute[d] the factual underpinnings of the Petitioners' alter ego claims," specifically claiming, "no facts support alter ego liability." *Id.*

In the instant case, Appellants assert that High-Def provided evidence of an undisputed claim when it submitted: (1) the contract signed by High-Def and Amana as "Sole Director, Peak Hotels and Resorts Group Ltd.;" (2) the invoice that High-Def sent to Amanat; (3) emails requesting payment from Amanat's email address and an address allegedly used by Doronin; and (4) return emails sent by Amanat that acknowledge the debt. In response, ARGL and Tarek argue that High-Def's claim was subject to a bona fide dispute because: (1) Amanat negotiated the contract before PHRGL even existed; (2) PHRGL never had any offices in Miami or New York, let alone at the locations where Amanat and Minhas contracted to install the equipment; (3) PHRGL has no records or any other evidence of this contract; (4) PHRGL never received any equipment reflected in the contract or otherwise derived any benefits from the contract; and (5) Amanat was the only person associated with PHRGL who had any knowledge of the contract. A1494 –A1495.

The Bankruptcy Court considered these arguments and stated plainly: "[W]hether or not [Amanat] had authority to [hire High-Def] on behalf of [PHRGL], that is the subject of a bona fide dispute, period." A1503. This issue decided the case because Judge Chapman was "simply identifying that based on the record before [her], [she could] find that there is a bona fide dispute" and because the Code simply requires that the claim not be subject to a bona fide dispute. A1502, A1505. The Bankruptcy Court made it clear, however, that it was "not making a factual finding." A1505.

Appellants argue that Judge Chapman erred in concluding that High-Def's claim was subject to a bona fide dispute. Specifically, they assert that there is no dispute that Amanat, in signing the contract on behalf of PHRGL, had actual and apparent authority to bind PHRGL.[14] Doc. 9, 38–42.

### i.    Actual Authority

"Actual authority is created by direct manifestations from the principal to the agent, and the extent of the agent's actual authority is interpreted in the light of all circumstances attending those manifestations." *Highland Capital Mgmt. LP v. Schneider*, 607 F.3d 322, 327 (2d Cir. 2010).

For the second contract, signed on January 22, 2014,[15] Appellants argue that Amanat had actual authority to bind PHRGL because, by that time, he was the director of PHRGL authorized to exercise the powers within the Articles of Association. Doc. 9, 41–42.

The Articles of Association, signed on January 17, 2014, gave PHRGL's director the powers "necessary for managing, and for directing and supervising, the business and affairs of the Company." A2261. Amanat assumed these powers on January 20, 2014, when he became a director of PHRGL. SA752. On January 22, 2014, Amanat allegedly ratified the contract with High-Def for a "technology implementation and integration project where the following technologies or systems will be implemented and integrated at the *Peak Hotels and Resorts*."

---

[14] To be clear, Judge Chapman did not determine whether Amanat had authority to bind PHRGL or not. She simply noted that a colorable question was raised about his authority. That was all she was required to do under § 303.

[15] According to the documents provided to the Court, Amanat signed and returned the contract on January 22, 2014. A1118–A1121. High-Def has repeatedly represented this information differently to the Court. *Compare* Doc. 9, 41 ("[PHRGL] and High-Def entered into two virtually identical contracts, one on January 17, 2014, the same day [PHRGL] was incorporated, and the other on January 21, 2014"), *with* Doc. 15, 20 ("The evidence before the Bankruptcy Court showed that PHRGL not only ratified its contract with High-Def on January 20, 2014, but also acknowledged the validity of the debt following High-Def's repeated attempts at collection."). The Court presumes that this inconsistency is accidental.

A1119 (emphasis added). Of course, by that time, according to the invoice, all work had been completed by High-Def. Appellees claim that PHRGL never had corporate offices in the United States, let alone at the locations where High-Def planned to install the equipment. Doc. 10, 29. In an email to Amanat, planning the project, Minhas referred to the Miami location as "an apartment" and asked whether it had a kitchen. A1257. Given the Articles of Association, "interpreted in the light of all circumstances attending those manifestations," it was not an error to conclude that a bona fide dispute existed about whether Amanat enjoyed actual authority to ratify a contract on behalf of PHRGL on January 22, 2014, to pay for services that had already been provided at his apartment. *Highland Capital Mgmt. LP*, 607 F.3d at 327.[16]

## ii. Apparent Authority

"Where an agent lacks actual authority, he may nonetheless bind his principal to a contract if the principal has created the appearance of authority, leading the other contracting party to reasonably believe that actual authority exists." *Highland Capital Mgmt.*, 607 F.3d at 328. However, "[t]he mere creation of an agency for some purpose does not automatically invest the agent with 'apparent authority' to bind the principal without limitation," and "[a] party cannot claim that an agent acted with apparent authority when it knew, or should have known, that [the agent] was exceeding the scope of its authority." *Id.* (internal quotation marks and citation omitted).

Appellants claim that Amanat had apparent authority because he presented himself to High-Def as PHRGL's sole director and because High-Def's reliance on Amanat's authority was

---

[16] Amanat clearly did not have actual authority to bind PHRGL on January 17, 2014, when he first signed the contract. PHRGL's Articles of Association, signed on January 17, 2014, provides that "the directors of [PHRGL] shall have all the powers necessary for managing, and for directing and supervising, the business and affairs of the Company." A2261. Amanat assumed these powers on January 20, 2014, when he became a director of PHRGL. SA752. When he signed the contract on January 17, 2014, he lacked actual authority to bind PHRGL.

reasonable.  Doc. 9, 28–29.  This reliance was reasonable, Appellants argue, because "Amanat was a wealthy entrepreneur, well known around the world" and because "[t]he complexity and nature of the work Amanat asked High-Def to perform left [High-Def] with the unmistakable impression that these services were for [PHRGL's] hotels, not Amanat himself."  *Id.* at 41.

This argument is unavailing.  Apparent authority "is normally created through the words and conduct of the principal as they are interpreted by a third party, and cannot be established by the actions or representations of the agent."  *Minskoff v. Am. Exp. Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir. 1996).  Furthermore, "[t]he existence of apparent authority is normally a question of fact."  *Id.*  In interpreting these principles, the Second Circuit has found that the assistant of a company's president acted without apparent authority because she applied for a corporate credit card without the company or its president's knowledge or consent.  *Id.* Appellants do not allege that High-Def communicated with anyone from PHRGL other than Amanat, its purported agent.  Because apparent authority could not derive from Amanat's actions alone, a bona fide dispute exists about Amanat's apparent authority.  The Bankruptcy Court did not err.

## B.    ARGL Case

During the November 30, 2017 hearing, the Bankruptcy Court stated that based, "on the language of the Code as to whether or not this claim is subject to a bona fide dispute, the involuntary [petition] should be dismissed and everything that was filed in furtherance of it and in connection with it, is void *ab initio*, and it goes away."  A1488–A1489 (italics added).  On appeal, Appellants argue that the Bankruptcy Court erred because it came to this conclusion without making factual findings or citing legal authority.  Doc. 9, 51–52.

If a debtor is ineligible for bankruptcy relief, the entire case is rendered void *ab initio* and, if a legal action is void, all subsequent proceedings are also void. *In re Rios*, 336 B.R. 177 (Bankr. S.D.N.Y. 2005) (finding a "case *void ab initio*" because the debtors were "ineligible for bankruptcy relief"); *In re Prud'Homme*, 161 B.R. 747 (Bankr. E.D.N.Y. 1993) (finding that a debtor was ineligible for bankruptcy and that "the filing is void *ab initio* and there exists no automatic stay for this court to address"); *In re Heating Oil Partners*, No. 3:08-CV-1976 CSH, 2009 WL 5110838, at *7 (D. Conn. Dec. 17, 2009) (holding that where a state court action was void *ab initio* as in violation of the automatic stay, "[a]ll subsequent proceedings . . . became void *ab initio*"); *In re An-Tze Cheng*, 308 B.R. 448 (B.A.P. 9th Cir. 2004) (where a cause of action is void *ab initio*, "everything that happens . . . with respect to the cause of action . . . is void *ab initio*"); *In re NCVAMD, Inc.*, No. 10-03098-8-SWH, 2013 WL 6860816, at *1 (Bankr. E.D.N.C. Dec. 31, 2013) ("[T]he commencement of the Condemnation Action . . . is void *ab initio*. Furthermore, all action taken . . . in reliance on such Condemnation Action are also void *ab initio*.").

Under these authorities, ARGL argues that the order that initiated its Chapter 11 bankruptcy is void because of the following causal relationship: If the Bankruptcy Court mistakenly sent PHRGL into Chapter 7 bankruptcy, the bankruptcy court lacked authority to take the actions it subsequently took, including appointing a trustee and permitting that trustee to replace ARGL's board and have its replacement director petition to send ARGL into Chapter 11 bankruptcy. Doc. 10, 50.

In reply, Appellants seek to distinguish these cases by arguing that they involve violations of involuntary stays and 11 U.S.C. § 109. Doc. 15, 29.

While the cases concern different areas of the law, they still stand for a valid proposition. As the Second Circuit has observed, "if [a court] act[s] without authority in the particular case, its judgments and orders are mere nullities, not voidable, but simply void, protecting no one acting under them, and constituting no hindrance to the prosecution of any right." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Because, as explained above, the court erroneously sent PHRGL into bankruptcy, that Bankruptcy Court correctly concluded that that court's subsequent orders are void.

## IV.     Conclusion

For the reasons set forth above, the Bankruptcy Court's Order is AFFIRMED. The Clerk of the Court is respectfully directed to docket this decision and close the cases, Nos. 18 Civ. 384, 18 Civ. 633, and 18 Civ. 681.

It is SO ORDERED.

Dated:     March 31, 2019
           New York, New York

                                          Edgardo Ramos, U.S.D.J.